# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
Executive Director
and Attorney-in-Chief

Southern District of New York
Jennifer L. Brown
Attorney-in-Charge

September 4, 2020

**BY ECF AND EMAIL**
Honorable J. Paul Oetken
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   **United States v. Brian Mora,**
      **19 Cr. 514 (JPO)**

Dear Judge Oetken:

Brian Mora was just 23 years old when he engaged in the offense conduct in this case, two shootings in September 2018. But in his 23 years, he had already suffered more trauma and loss than most people experience in a lifetime. As a result, he is diagnosed with post-traumatic stress disorder ("PTSD") and polysubstance use disorder, both of which contributed to his poor judgment in this case. Through it all, he has remained a loving and supportive brother, father, and son, who has the grit and insight necessary for rehabilitation.

Ten years of imprisonment is the mandatory minimum sentence, the Guidelines sentence, and the sentence recommended by the Probation Department. It is a gargantuan sentence to impose for any crime, and it is sufficient in this case in light of Brian's youth, his mitigating personal history and characteristics, and the harsh conditions of his confinement at MCC.

Accordingly, I ask the Court to adopt the PSR's recommendation and impose a Guidelines sentence of 10 years.

## BACKGROUND

Brian's offense conduct—two shootings—is undeniably very serious. It was, in Brian's words, "wrong and very dangerous." **Exhibit A** (Letter of Brian Mora). But the offense is mitigated by Brian's youth and his history of trauma and abandonment, leading to PTSD, addiction, and a hyperactive fight-or-flight response that impeded his judgment. Brian has the motivation and the ability to address these issues and can expect his future to be brighter than his past.

Honorable J. Paul Oetken                                          September 4, 2020
United States District Judge                                                    Page 2

**Brian's Nightmarish "Childhood"**

      Born in late 1994, Brian first experienced homelessness at age 6, when his abusive father kicked him and his older brother Manny out of their apartment in the Bronx.  For months they slept in the street and ate discarded food they found in dumpsters.

      At age 7, Brian moved back in with his mother, Francisca Australia, after she separated from Brian's father.  Brian still wanted his father's love and approval, but his father took no interest in him.  Instead, Brian was left with his mother's new boyfriend, who raped Brian repeatedly, as did another of his mother's friends, and one of Manny's friends.  Brian's mother's boyfriend manipulated him because he knew Brian loved dogs.  He promised Brian a puppy if Brian would perform oral sex on him and let him touch Brian.  No one ever gave Brian a puppy.  Instead the sexual abuse "happened so often I thought it was normal."  **Exhibit B** at 4 (Psychological Evaluation Report of Edward Fernandez, Psy.D.).

      Brian frequently ran away from home during these years; each time the police brought him back, and his mother's boyfriend beat him brutally.  Brian didn't tell anyone about the sexual abuse because he was afraid of his mother's boyfriend.

      When he was about nine years old, Brian began accompanying his mother on frequent trips to the Dominican Republic.  She was working as a drug courier.  When Brian was about 13 years old she was arrested and deported.  Brian hasn't seen his mother in more than 10 years.

      Upon his mother's deportation, Brian went into ACS custody and was separated from his siblings.  No one adopted him.  "I grew up in the system," he writes.  Ex. A.  Since then, he has lived at the ACS "Children's Center" in Manhattan, he has been homeless, and he has been in prison.

**Brian's PTSD and Substance Abuse**

      As a result of the abuse, neglect, abandonment that he suffered, Brian has PTSD.  See Ex. B at 8–9.  He has experienced hypervigilence and displayed impulsivity and other mood and behavioral issues since childhood.  Brian's impulsive reactions to real and perceived threats contributed to his present offense.  "Developmental research suggests that exposure to childhood abuse may be a major risk factor for emotion regulation difficulties that persist into adulthood, with children showing [] both emotional regulation and behavioral problems, such as more anger, lack of self-control, and high levels of negative affect."  Id. at 9.

Brian's trauma has never been addressed by mental health professionals.  Instead, he was misdiagnosed with ADHD as a child, prescribed Ritalin, and placed in Special Education classes.  "When he was in the first grade they started to give him medication.  He was put in special ed because he couldn't focus in class and wasn't learning how to read or write."  **Exhibit C** (Letter of Francisca Australia).  (Brian would ultimately leave school after fifth grade, without learning how to read.)

Brian also "self-medicated" his pain from a young age with a variety of illegal drugs, including heroin, marijuana, alcohol, cocaine, and MDMA.  "It is clear that drug use has had a significant impact on his life including insight and [judgment] on his actions and behaviors."  Ex. B at 9.

## Hope for Brian's Future

Although Brian's traumatic childhood certainly contributed to where he finds himself today, it need not define his future.

Those who know Brian best know him to be an "outstanding lovable person" who is "is always worrying about everyone except him[self]," and is especially kind to children.  **Exhibits D & E** (Letters of Carolina Blanco and Lina Nunez).  He is a devoted father and a wonderful uncle.  "[I]f he had something, whether he needed it or not, he would give it to you.  He is really honest and would always admit if he did something wrong."  **Exhibit F** at 1 (Letter of Rosanna Mora).  He regularly helps elderly neighbors with their bags.  **Exhibits G & H** (Letters of Victoria Maldonado and Amanda Avila).  He was working up until the time of his arrest.

Brian is remorseful for his offense and has demonstrated insight into his mental-health and substance-abuse challenges.

Before the pandemic, Brian met regularly with Taylor Lauesen, a social work intern at the Federal Defenders.  In her letter to the Court, **Exhibit I**, Ms. Lauesen describes Brian's progress during these sessions, and specifically how Brian began to address his history of trauma and better mediate his responses to stressful situations.  She writes:

> Brian has experienced extreme hardship, trauma, and loss in the quarter of a century that he has been on this planet.  On the flip side, Brian also recognizes and takes ownership for the choices he has made, even if the choices themselves were somewhat constrained.  It is this holding space of both of these elements where I think Brian was able to really grow as a person and start to believe he can be a better man in the future, outside of the criminal justice system.

Ex. I at 2.  She concludes, "I see Brian as an example of someone who takes back control of their own life, who no longer allows outside forces to trigger an instinctual fight or flight responses, but rather mindfully moves through the world with the knowledge he can shape his future."  Id.

Brian is capable of this rehabilitation because he is young and possesses a lot of grit.  He will also benefit from intensive substance-abuse and mental-health treatment.  Ex. B at 10.  Before this incarceration, Brian was essentially illiterate.  But he has taught himself to read over the last two years.  He asked Ms. Lauesen to send him a dictionary and a cursive writing workbook.  Now every time he encounters a new word, he looks it up, writes it over dozens of times, and writes out the definition.

Brian says: "I want to make it home so I can show myself that I can accomplish something in life, and to me there for my daughter and my mom. I know I can do it."  Ex. A.  He plans to get his GED while he's in prison and to go to work as soon as he gets out.  Ultimately he hopes to open up his own business.  He has a number of ideas: a barbershop, a jewelry store, a dog kennel, or a technology company.

## ARGUMENT

The Court should adopt the PSR's recommendation in this case and impose a Guidelines sentence of 10 years.

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)."  United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013).  That provision directs sentencing courts to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," i.e., "proportionality, deterrence, incapacitation, and rehabilitation."  Id.  "In deciding what sentence will be 'sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."  United States v. Singh, 877 F.3d 107, 121 (2d Cir. 2017) (second internal quotation marks omitted).

Ten years—which is at once the statutory minimum, the Guidelines sentence, and the PSR's recommendation—is an incredibly severe sanction. It adequately reflects the seriousness of Brian's offense and is more than sufficient in light of his youth, his mitigating personal history and characteristics, and the horrendous conditions at MCC.

Brian was 23 years old when he committed this offense. Psychologically, because his lack of education and his institutionalization, he

was younger still.  See Ex. A ("From 19 to 23 I was locked up.  When I got out at 23 I still felt like I was 19.").[1]

    Brian's age is important for two interconnected reasons:  first, young people are less culpable because their judgment and impulse control are not as developed as an older person's; and, second, young people have a far greater capacity for change.  Graham  v. Florida, 560 U.S. 48, 68, 74 (2010) (explaining that youth have "lessened culpability" and greater "capacity to change"); see also Roper v. Simmonds, 543 U.S. 551, 569 (2012) (explaining that young people are more vulnerable to negative influences and peer pressure, and it is more likely that their deficiencies will be reformed).  In Brian's case, the "mitigating qualities of youth," including such "hallmark features" as immaturity, impetuosity, and failure to appreciate risks and consequences," Miller v. Alabama, 132 S. Ct. 2455, 2467 & 2468 (2012), are amplified by Brian's PTSD and drug addiction, which impaired his judgment and left him prone to respond impulsively to real and perceived threats.  By the same token, because of his youth—and his grit and the counseling and treatment he will receive on supervised release—there is every reason to hope and expect that Brian will be able to reform himself and live a pro-social life together with the friends and relatives who have written letters of support to this Court.

    In addition, the Court should consider that a 10-year sentence in this case at this time is even more severe than that sentence would be in other circumstances.  As an initial matter, the Court should be aware that Brian was serving state parole time until August 7, 2019, so he received no federal credit for the first eight months he spent at MCC.

    Brian has spent his time at MCC under extraordinarily harsh conditions of confinement.  His first months at MCC coincided with the 2018–19 government shutdown, which resulted in an extended lockdown and loss of visitation due to short staffing.  He was still there in February 2020, when the facility locked down completely for eight days while correctional officers ransacked cells looking for a loaded gun, which they ultimately found in the

---

[1] Moreover, the human brain does not reach full maturity until at least an individual's mid-20s.  "The frontal lobes, homes to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life."  See Johnson, et al., Adolescent Maturity and the Brain, J. Adolescent Health 2009, available at the US Nat'l Library of Medicine, Nat'l Inst. of Health, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/; Miller v. Alabama, 132 S. Ct. 2455, 2465 n.5 (2012) ("It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance.") (quoting brief for Lawrence Aber et al. as Amici Curiae).

Honorable J. Paul Oetken                                    September 4, 2020
United States District Judge                                           Page 6

possession of an inmate on Brian's unit, 7-North.  As a result of that search,
Brian lost all of his personal property (including his dictionary, which we
later replaced) and legal work, and he was moved to 5-South, where an
inmate who had heard that Brian's older brother Manny was a government
cooperator later sliced Brian's face and neck with a razor blade.  (It is
concerning, to say the least, that this inmate had access to a razor even after
the eight-day search).

        Brian remains at MCC now, during the COVID-19 pandemic.  Brian
believes he contracted the virus in March because he lost his sense of taste
and smell and experienced intense vomiting, but the facility never tested him
or provided medical care.  But the harshness of Brian's imprisonment at
MCC is not limited to the direct physical health risk.  All visits, including
visits from counsel and social workers, have been suspended since March 13,
and the jail has been on lockdown or "modified operations" where inmates are
locked in their cells upwards of 23 hours per day.  We expect these conditions
to continue for some time.

        Many courts, including this Court, have recognized the current harsh
conditions as a mitigating factor at sentencing.  See United States v.
Elizabeth Paez Vazquez, 20 Cr. 28 (JPO) (June 8, 2020) ("In light of these
conditions, I think that the six months she has already served are more
punitive than in ordinary circumstances."); see also, e.g., Juan Carlos
Aracena de Jesus, 20 Cr. 19 (PAE) (July 1, 2020) ("My colleagues and I
commonly informally credit prisoners who have served time awaiting
extradition in dreadful prisons overseas with more time served than
measured by the calendar.  The same logic applies here . . . .  Your time in the
MCC was way harder than anyone intended when you were detained
following your arrest.").  The Court should do so here.

**CONCLUSION**

        Ten years is an extremely severe sentence to impose on a young person
who "really didn't have a chance to grow up."  Ex. A.  It is sufficient, and any
longer sentence would be greater than necessary.

                                        Respectfully submitted,

                                        /s/
                                        _____
                                        Clay H. Kaminsky
                                        Assistant Federal Defender
                                        Federal Defenders of New York
                                        (212) 417-8749

CC:    AUSA Danielle Sassoon

# EXHIBIT A

Dear Judge Oetken,

First I want to say to you that I am sorry for what I did, I am sorry for my actions. I do know that what I did was wrong and very dangerous.

I really didn't have a chance to grow up. I grew up in the system, and I didn't get to have a real childhood. From 19 to 23 I was locked up. When I got out at 23 I still felt like I was 19. When I came out things were difficult for me. I didn't really have a stable home. All I want is an opportunity, that's all I ask for and that's all I need. I know I can't waste more time. I am only 25 years old, which is young but I know it's not young anymore.

I want to work on my education and get my GED while I'm in here. When I come home, I want to open up my own business. I have experience with construction and buffing and want to continue doing that work. There are a lot of things that I want to do with my future. By the time I come home I know that my daughter is going to be almost grown, and I just want an opportunity to be with her and be part of her life. I also hope I can see my mom after I am released. She is sick and I'm worried I won't be able to see her when she passes. My grandfather died while I was locked up previously, and I'm worried my mother and grandmother might pass before I'm released. I haven't seen my mother since I was 13. Hopefully after my sentence she still alive and I can visit her. That's one of the things that has really got me stressed out. When I came home I promised her I was going to do the right thing and come see her when I was done with parole. I broke my promise and I feel terrible about that.

I just want to see my daughter and mom, that's all. It kills me and eats me up inside when I think about them. I think about how she is going to be a teenager by the time I come home, and I wasn't there for so much of her life. It's painful to know that due to my actions I am now going to miss another big part of her life, and that I might never get my daughter back. There is nothing I can do to get this time back, I can't replace her and nothing will ever amount to her. My sister also just had a child and I wish I could have been there to get everything she and the baby needed, but I know I wasn't there because of my actions.

I want to make it home so I can show myself that I can accomplish something in life, and to be there for my daughter and my mom. I know I can do it. That's the opportunity I'm asking for.


Thank you,

Brain Mora

# EXHIBIT B

# FIVE BOROUGH FORENSICS

Edward Fernandez, PsyD
204 W84th Street, Suite 2-205
New York, NY 10024
fiveboroughforensics@gmail.com
www.fiveboroughforensics.com

**CONFIDENTIAL PSYCHOLOGICAL REPORT**

**Prepared by Dr. Edward Fernandez**
Clinical Director
Five Borough Forensics
NYS Licensed Clinical Psychologist (NY: PSY19609)
Date of Report: 07/10/2020

FIVE BOROUGH
FORENSICS

## Table of Contents

I.      Reason for Referral..................................................................................................3

II.     Tests Conducted and Supplemental Information ............................................3

III.    Relevant Background Information .....................................................................4

IV.     Results of Testing:..............................................................................................6
        Mental Status Exam: ........................................................................................6
        Psychological Symptom Screen........................................................................6

V.      Summary of Findings and Conclusions ...........................................................8

**FIVE BOROUGH**
**FORENSICS**

**PRIVILEGED CLIENT/LAWYER DOCUMENT**
**CONFIDENTIAL PSYCHOLOGICAL EVALUATION**

**I.  Reason for Referral:**

A request for a forensic psychological evaluation of Mr. Brian Philip Mora (referred to as Mr. Mora throughout this document) was made by his counsel, Mr. Clay Kaminsky of the Federal Defenders, Inc.   The request was made to better understand mental health and substance use history.

**II. Tests Conducted and Supplemental Information**

Informed Consent:

Mr. Mora was given and read an informed consent form to sign prior to our initial meeting. The informed consent explained the purpose of this evaluation, the nature of the evaluation and the limits of confidentiality within the bounds of this evaluation. Mr. Mora appeared to demonstrate a basic understanding of the informed consent.

Psychological Evaluation:

- Clinical Interview
- Mental Status Exam
- Post-Traumatic Stress Disorder Checklist for DSM-5 (PCL-5)
- Hamilton Depression Rating Scale (HAM-D)
- Hamilton Anxiety Rating Scale (HAM-A)
- Short Michigan Alcohol Screening Test (SMAST)
- Drug Abuse Screening Test (DAST)

Records Reviewed:

- Mr. Mora's PSR, dated 07/02/19 and 06/17/2020
- Mr. Mora's DOCCS Medical Records, dated 11/29/2017

Summary of Findings/Recommendations:

- Mr. Mora meets criteria for **severe cocaine, cannabis, alcohol, heroin, ecstasy (MDMA)**
- Mr. Mora meets the criteria for **post-traumatic stress disorder (PTSD).**
- Mr. Mora would benefit from continued intensive substance abuse and mental health treatment in a structured environment as he progresses through developing skills necessary for a sober lifestyle and to reduce recidivism.

**FIVE BOROUGH**
**FORENSICS**

**III. Relevant Background Information:**
*Report is based on interview unless otherwise indicated. Client was interviewed in both Spanish and English as preferred by the client as this clinician is a bilingual native Spanish speaker.*

**Name:** Brian Philip Mora
**Age:** 25
**DOB:** 12/11/1994
**Ethnicity:** Hispanic/Dominican
**Language of Evaluation:** Spanish/English
**Date of Evaluation:** 05/10/2019

Mr. Mora was born in Manhattan and raised in the Highbridge area of the Bronx, New York. He grew up in a family with his grandmother and uncle. He stated, "My mother was not around, she was still trying to have fun, she was young." However, he stated, "she worked two jobs and made sure we ate." Mr. Mora has 5 siblings with ages ranging between 14 – 28. Mr. Mora's mother and father had a sporadic relationship, and, throughout his childhood, his housing changed rapidly. Mr. Mora had a period of time where he lived with his father, but then his father did not want Mr. Mora or his brother to remain with him, and Mr. Mora lived with his mother and his mother's boyfriend. Mr. Mora also described a period of his childhood in which him and his brother were homeless and having to live on the street.

Mr. Mora described a difficult childhood, experiencing multiple forms of physical and sexual abuse. Between the ages of approximately 4-5 years old, he lived with his father and mother. During that time, he witnessed domestic violence perpetrated by his father towards his mother. He eventually relocated back to his grandmother's home and eventually with his mother's boyfriend. Mr. Mora also witnessed domestic violence perpetrated by his mother's boyfriend towards his mother. Between the ages of approximately 7 – 9 years old, Mr. Mora was physically and sexually abused by his mother's boyfriend, one of his brother's friends and one of his mother's friends. He denied reporting this to anyone and stated, "I just held it in." He stated,

> "It started when I was about 7. Leonardo [mother's boyfriend] started touching me, making me perform oral sex. That went on for about one year. My brother's friend also molested me. My brother knew what was going on but didn't do anything about it. His friend raped me. It happened so often that I thought it was normal."

Mr. Mora also reported that his mother and her partner would abuse drugs, including alcohol, cannabis and PCP. Due to this type of environment and abuse, Mr. Mora would attempt to escape his environment by running away from home, however, he would always return. Upon his return, he stated he would be physically abused by his stepfather as a form of punishment.

Throughout his childhood, Mr. Mora also reported that his mother attempted suicide on three occasions. The first occurred when he was approximately 7 years old in which his mother ingested rat poison. The second occurred when he was approximately 10 years old and his mother overdosed on pills. The third attempt occurred when she attempted to jump off a roof. During one of her overdoses, Mr. Mora recalls finding his mother "foaming at the mouth" in their kitchen.

**FIVE BOROUGH**
**FORENSICS**

At approximately 9 years old, Mr. Mora described frequently traveling with his mother to the Dominican Republic.  His education was interrupted as he was not placed in school and as a result is unable to read or write.  Throughout this time, while travelling with his mother, his mother's partner continued sexually abuse him.  His mother was eventually incarcerated when he was 13 and eventually deported, leaving him alone.

In 2010, Mr. Mora reported being incarcerated for approximately one year.  Upon his release, he did not receive any family support and was placed into Administration for Child Services (ACS) Children's Center in Manhattan.  He stated, "They couldn't find anybody to adopt me and I kept running away.  I lived from place to place, stayed with my aunt through marriage at her boyfriend's house a little.  I didn't have anything."  In 2011, Mr. Mora met the mother of his child.  They were both underage and he stated, "We had nowhere to go, we both kept running from ACS.  They ended up placing her in a mother/child home and my daughter was born in 2012."  When Mr. Mora turned 18, he signed himself out of ACS and was able to move into an apartment with her.

Mr. Mora has two children from two separate relationships.  He reported having a positive relationship with both women and remains in communication with his children.  Mr. Mora admitted to being involved with the criminal justice system, "I was in from 2014 – 2015, came out and would go right back in.  Came back out and was on parole with this new charge."  Mr. Mora also reported having various employments while in the community including working in construction, however, these were interrupted by his criminal justice involvement.

**Substance Use History:**

Mr. Mora began using substances during childhood.  He began using alcohol at approximately 8 years old and described his drinking patterns as consuming alcohol socially.  He began using cannabis at 8 years old and described using cannabis on a daily basis.  He stated that he first used "ecstasy" at age 12 and used a few times per month.  Mr. Mora reported using cocaine intranasally at 13 years old and used several times per month.  He also would mix cannabis and cocaine.  He used methamphetamine at age 15 and used when available.  Mr. Mora first used heroin intranasally at approximately 15 years old.  He began using on a daily basis and identified this drug as his drug of choice.  In addition, he has used Percocet and morphine with heroin, using Percocet on a daily basis.  Mr. Mora has also used other drugs such as hallucinogenic and PCP in the past.

Mr. Mora has attended drug treatment in the past with Fortune Society in 2015 and his most recent in 2018, he reported entering into a drug program through Samaritan Village.  He has been prescribed suboxone in the past, however, he relapsed on heroin and was eventually discharged from the program.  He began using approximately 5 bags of heroin daily.

While incarcerated, he reports functioning well, and believes that he will need support on remaining abstinent.

FIVE BOROUGH
FORENSICS

**Psychiatric History:**

Mr. Mora began psychiatric treatment during his childhood and was diagnosed with attention deficit hyperactivity disorder (ADHD) and recalls being prescribed 90mg of Ritalin, a psychostimulant medication. He stated that when he would take his medication, he would become "real quiet" and would not eat. He also recalled that there were periods of time that he described "hallucinating" while taking this medication, and his brother "knocking my teeth out," for his behaviors.

Mr. Mora also reported having been diagnosed with bipolar disorder, post-traumatic stress disorder (PTSD) and depression during previous incarceration. In regard to his bipolar disorder, Mr. Mora described experiencing significant shifts in his mood. Of note, given Mr. Mora's consistent drug use, confirmation of a mood disorder would be challenging. In regard to his diagnosis of PTSD and depression, Mr. Mora was able to describe experiencing flashbacks of his abuse, paranoia, crying spells, irritability, anxiety and avoiding memories of his previous experience. He attributes his drug use to managing these symptoms which he experiences on a daily basis.

**IV. Results of Testing:**

A.  Mental Status Exam:

Mr. Mora presented for his interview appropriately dressed for his environment with appropriate and clean clothing and with good hygiene. His demeanor was pleasant and cooperative, although somewhat guarded. He remained amiable throughout the interview, although at times it was clear that it was difficult for him to recount the information being requested (i.e., history of abuse, drug use). He remained focused for the entirety of the interview. Mr. Mora presented alert and fully oriented throughout the interview. His speech was normal in rate, rhythm and tone and he maintained predominantly appropriate eye contact. There were times where he would look away, or down when discussing periods of trauma and experiencing symptoms of depression. His thought processes were logical and goal directed. His affect (i.e., emotional display) was appropriate to the situation and consistent with his stated mood of "okay". Throughout his interview, Mr. Mora affect matched content discussed. He denied any current suicidal and homicidal ideation. He also denied delusions or hallucinations of any kind and showed no evidence of a thought disorder. Considering his consistent attention and full engagement during the clinical interview, the results of this evaluation are believed to provide an accurate reflection of his present functioning and it is believed that he approached this interview openly and in a genuine manner.

B. Psychological Symptom Screen:

Mr. Mora was administered the PTSD Checklist for DSM-5 (PCL-5). This measure was chosen as it has reliable and valid psychometric properties. It is a standardized self-report rating scale for post-traumatic stress disorder (PTSD) comprising 20 items that correspond to the key symptoms of PTSD. Respondents rate each item from 0 ("not at all") to 4 ("extremely") to indicate the degree to which they have been bothered by that particular symptom over the past month. The PCL-5 asks about symptoms in relation to "stressful experiences." The symptoms endorsed may not be specific to just one event, which can be helpful when assessing survivors who have symptoms due

FIVE BOROUGH
FORENSICS

to multiple events. The total possible scores range from 0 to 80. This scale has a cut-off score of 33 for indicating a probable diagnosis of PTSD.

Based on the results of the PCL-5, Mr. Mora scored 62, indicating that he endorsed symptoms that would meet a diagnosis of post-traumatic stress disorder (PTSD). His highest scores were on:

- Repeated, disturbing, and unwanted memories of the stressful experience
- Repeated, disturbing dreams of the stressful experience
- Suddenly feeling or acting as if the stressful experience were actually happening again, or reliving the experience.
- Feeling very upset when something reminded you of the stressful experience
- Having strong physical reactions when something reminded you of the stressful experience (for example, heart pounding, trouble breathing, sweating)
- Avoiding memories, thoughts, or feelings related to the stressful experience
- Avoiding external reminders of the stressful experience (for example, people, places, conversations, activities, objects, or situations)
- Trouble remembering important parts of the stressful experience
- Feeling distant and cut off from others
- Having strong negative beliefs about yourself, other people, or the world (for example, having thoughts such as: l am bad, there is something seriously wrong with me, no one can be trusted, the world is completely dangerous)
- Irritable behavior, angry outbursts, acting aggressively
- Taking too many risks
- Feeling jumpy or easily startled
- Having difficulty concentrating
- Trouble falling asleep or staying asleep

Throughout this interview, Mr. Mora identified multiple instances of abuse occurring throughout his childhood. This included sexual abuse, neglect, lack of parenting, lack of stable household, and witnessing domestic violence. He identified areas of his mental health, such as his self-esteem, anger, and impulsivity, which he believes have been affected by experiencing these traumas. In addition, his severe substance use can be understood as an attempt in managing how these traumas have affected him. Mr. Mora elaborated on this, discussing how his substance use allowed him to dissociate from the long term emotional caused by these incidents.

Mr. Mora was also administered the Hamilton Depression Rating Scale (HAM-D) and the Hamilton Anxiety Rating Scale (HAM-A). These rating scales were developed to quantify the severity of depressive and anxiety symptomatology. Each item is rated on a 5-point scale, ranging from 0 (not present) to 4 (severe). On the HAM-D, Mr. Mora obtained a score of 14, indicating moderate depressive symptoms. Mr. Mora's highest scores were on his feelings of depressed mood, feelings of guilt, some insomnia, indecisiveness, and fears. On the HAM-A, Mr. Mora's score was a 19, indicating he does have moderate anxiety symptoms. Of note, his highest scores were associated with having constant worries, fearful anticipation, tension, fears, difficulty concentrating, and anxious mood during interview.

Mr. Mora expressed insight into the symptoms of depression and anxiety he has experienced,

**FIVE BOROUGH**
**FORENSICS**

identifying his guilt regarding his involvement with drugs, feelings of low self-worth associated with his current position in life and remorse for his involvement with the criminal justice system.

The Short Michigan Alcohol Screening Test (SMAST) is a 13-item questionnaire composed of questions that require a "Yes/No" response in order to assess for problematic alcohol consumption. Three or more positive answers on this screen indicates probable alcohol use problems. Mr. Mora endorsed responses associated with problematic alcohol use. Mr. Mora was also administered the Drug Abuse Screening Test (DAST). The DAST is a 28-item self-report scale that consists of "Yes/No" responses in order to asses for problematic drug use. The DAST has exhibited valid psychometric properties and has been found to be a sensitive screening instrument for the abuse of drugs other than alcohol. Scores above a 11 indicate the probable substance abuse. Mr. Mora's score was a 21, indicating that Mr. Mora has a probable substance use disorder. Mr. Mora indicated his drugs of choice as cannabis, cocaine, opiates, methamphetamine, 'ecstasy', and prescription medications. He displayed insight into his history of drug use, including his difficulty in remaining abstinent without support.

## V. Summary of Findings and Conclusions

### Diagnosis based on Diagnostic Statistical Manual 5 (DSM-5)

- **Post-Traumatic Stress Disorder (PTSD), chronic**
- **Severe Cocaine Use Disorder, in partial remission, in a controlled environment**
- **Severe Cannabis Use Disorder, in partial remission, in a controlled environment**
- **Severe Alcohol Use Disorder, in partial remission, in a controlled environment**
- **Severe heroin use disorder, in partial remission, in a controlled environment**
- **Severe ecstasy (MDMA) use disorder, in partial remission, in a controlled environment**

Mr. Mora is a 25-year-old Hispanic man and the father of two children not in his custody. Mr. Mora reported a limited employment history with various employments. Prior to his incarceration, Mr. Mora did not have a stable residence. Mr. Mora described a history significant for multiple instances of physical and sexual abuse occurring throughout his childhood. Mr. Mora reported having an unstable living environment and absence of parental figures. Mr. Mora began substance use during his late childhood and has continued up until prior to his incarceration. This substance use has interfered with his social, emotional and vocational responsibilities. Mr. Mora discussed feelings of low-self-worth, feeling helpless and seeking ways to address his substance use. He expressed remorse for his current involvement in the criminal justice system and discussed committing himself to achieving a more productive and sober lifestyle.

**Based on the PCL-5, Mr. Mora meets the criteria for post-traumatic stress disorder (PTSD).** The five diagnostic domains of PTSD are: 1) Being exposed to a perceived life-threatening event, 2) Re-experiencing the event, 3) Avoiding reminders of the event, 4) Worsening of negative thoughts and feelings after the event, and 5) Trauma-related arousal and reactivity that began or worsened after the trauma. Mr. Mora identified multiple incidents that contributed to the development of symptoms of PTSD. These include the multiple instances of childhood sexual abuse, neglect, lack of parenting, lack of stable household, and witnessing domestic violence

FIVE BOROUGH
FORENSICS

Throughout this time, he described having limited access to a mental health support system in managing his responses to trauma.

Mr. Mora's symptom presentation appears to be best characterized by trauma related symptoms warranting a diagnosis of PTSD. His childhood and adolescent experiences have had a significant impact on his daily functioning including significant changes in mood, thoughts and behaviors. **The aforementioned types of responses to a traumatic event tend to go unnoticed, especially in minority populations that have limited access to, and support from, community resources such as legal, medical and mental health support.** It is important to note that Mr. Mora has been diagnosed with attention deficit hyperactivity disorder (ADHD) and bipolar disorder. As a child, Mr. Mora described having received services for impulsivity, difficulty concentrating and mood instability. While Mr. Mora exhibited behavioral symptoms as a child, these symptoms may be better explained by the emotional response to the multiple stressors and trauma he experienced. Exposure to child abuse is associated with many maladaptive outcomes including risk for the development of a range of psychiatric conditions with increased rates of depression, posttraumatic stress disorder (PTSD), and other trauma-related psychopathology. Developmental research suggests that exposure to childhood abuse may be a major risk factor for emotion regulation difficulties that persist into adulthood, with children showing show both emotion regulation and behavioral problems, such as more anger, lack of self-control, and high levels of negative affect. In addition, as an adult, Mr. Mora has also received a diagnosis of bipolar disorder. This mental illness is characterized by symptoms of mania (i.e., increased energy, impulsivity, decreased need for sleep, irritability). Behavioral symptoms trauma can also present similarly to symptoms of mania. In addition, Mr. Mora has a long history of substance use, which would complicate ruling out a substance induced mood disorder.

**Mr. Mora meets criteria for diagnosis of severe polysubstance use disorder, in partial remission, in a controlled environment.** While Mr. Mora reported an extensive substance use history significant for cocaine, alcohol, heroin, ecstasy, amongst other drugs. Mr. Mora reported using these drugs on regular basis throughout his adolescence and into his adulthood. He recognized how his addiction has worsened, and how he has built a tolerance to these drugs. Mr. Mora reported periods of sobriety. During his incarceration, Mr. Mora has reflected on his substance use and how it has interfered with his life goals, employment, and relationships. Mr. Mora was raised in a community, social network and family which was based on drug use. His daily life patterns were associated with spending a predominant amount of time obtaining, taking, or recovering from the effects of drugs. He continued using increased amounts of drugs despite notable interference and disruptions to interpersonal relationships. It is clear that drug use has had a significant impact on his life including insight and judgement on his actions and behaviors.

By his own report, Mr. Mora has been successful in environments that have high structure. Mr. Mora would benefit from continued intensive substance abuse treatment as he progresses to a sober lifestyle. In addition, Mr. Mora presents with symptoms of trauma associated with the multiple traumas he has suffered throughout his life. He would benefit from mental health monitoring and treatment. **He displayed insight into his mental health and severe substance use and expressed genuine remorse of the impact his substance use has had on himself and others and appears motivated to address his addictions. In addition, Mr. Mora has made positive behavioral changes when engaged in mental health and substance use treatment.** He has expressed an

**FIVE BOROUGH FORENSICS**

understanding that he would benefit from intensive treatment to develop coping skills to manage his addiction and actively work to avoid relapse.

**Mr. Mora would benefit from continued intensive substance abuse and mental health treatment as he progresses through developing skills necessary for a sober lifestyle.**  He has been thoughtful in reflecting on his experiences and taking time to process them.  He would receive maximum benefit from having the opportunity to engage with the appropriate level of treatment in order to address his substance use and mental health.

_____
Edward Fernandez, PsyD
Clinical Director
Five Borough Forensics
NY: PSY19609

# EXHIBIT C

Dear Judge Oetken,

My name is Francisca Australia and I live in the Dominican Republic, in Santo Domingo. I am Brian Mora's mother. Before the coronavirus I was working in a Chinese restaurant, but now we are at home. When everything goes back to normal I will return to my job.

Brian was always very sick as a child. Before he was 6 months old he had an asthma attack. My mom told me he was wheezing and that he had lost his color, we called the ambulance. He was in the ICU for six months, and then in Lincoln hospital for longer. When he was in the first grade they started to give him medication. He was put in special ed because he couldn't focus in class and wasn't learning how to read or write. All of my children were put through special ed, even the youngest who is 14.

When he was growing up we had problems with his father, there was a lot of domestic violence. He hit me and he hit the kids. Brian hasn't been the same since, the domestic violence traumatized him, but Brian was still devastated when his father left. He was a young boy and his father was the light of his eyes, he looked up to him so much. Brian started to have emotional problems and started seeing a therapist in school, I think because of everything he was going through. After his father left Brian would try to go see him because he lived nearby. Brian's father would tell him he would meet him to spend time together and give him money, but when Brian showed up he would never be there. Brian would stand outside the building waiting and then come home crying. I would try and comfort him, and would tell him I would give him the money, but he just wanted his dad. He has always been a very loving boy looking for love and affection. Family has always been important to Brian. He is amazing with children. He is so popular with his nieces and nephews, and he loves his kids so much.

When I was deported and my kids went into the system they were abused, including Brian. I wanted him and my kids to stay with my mom and I don't know why they were taken into the system instead. Brian and all of my kids were traumatized, it's so terrible. He was still a child and didn't get the support he needed. They were all separated from each other and from their family, and they didn't have this family support when they were growing up and going through this. After I was deported, and while Brian was in the system, it was hard for me to get in touch with him since he kept getting moved around. I haven't been able to see Brian in more than 10 years.

After Brian came home, before he got arrested again, he was sleeping on the train but he was doing his best to work too. Before Brian got arrested this time he sent me a photo of him and his dad. He saw his father before he got arrested and asked him for help, but his father didn't help him. I wish I had been there instead to help my son, I feel helpless being so far away. I know my son needs help.

Brian has been through so much. Sometimes Brian is very happy and sometimes he becomes very depressed. When Brian was incarcerated for the first time, he tried to kill himself, and he has tried to kill himself again since then. He told me he tried to kill himself after this arrest. Now I can't sleep at night because I am worried Brian is going to try and hurt or kill himself. I am afraid and cry when I think about him.

I know it's hard for Brian to be away from family. Brian's grandfather died when he was incarcerated and when we talk he tells me that he is afraid of me and my mom dying while he is incarcerated. When I speak to him he told me take care of myself because he wants to see me again. He wants to see his

brothers and sisters so much too, they got separated when they were so young. His sister Lina just had a baby too. It's hard to see my kids in this position. Brian has spent so much time separated from his family I'm worried his younger siblings are going to forget his face.

Judge, I hope that you can get Brian help with medication and doctors. He needs to be medicated and he needs support, and I tell him this when we speak. I know Brian wants help. I hope that he can get help with learning how to read and write better too. He told me he wants to get his GED while he is in prison. As a mother I am worried about Brian not getting the support he needs in prison. The family tries to talk to him so he can express himself to us to help him emotionally.

I understand Brian made a mistake and that we have to pay for our mistakes. Brian recognizes that he needs help, and I think he needs a psychologist and medication. I am asking you to help my son, and I will do my best to help him too. I tell him when he gets out he can work with his hands, in construction again like he used to, and that there are programs that can help him.


Thank you,

Francisca Australia

# EXHIBIT D

4/30/20

Honorable J Paul Oetken
United States District Judge

Hi my name is Carolina Blanco I am a personal care aide. I am Bryan Mora's sister in law .We
are  more like brother and sister . We both grew up together in the same neighborhood. I know
Bryan Mora for  about 20 years now . Me and him are very close due to my kids which are his
niece and nephew's.

I always knew Bryan to be an outstanding lovable person especially with his niece and nephews.
He always came around to see his nieces and nephews.  He would even buy them things at the
store . Every time Bryan was around he was very helpful and always engaged with my kids he
would  come by play with them,  spend time and even teach them things they didn't know. He
would also take bunch of pictures with them. He is a great uncle. Since young he's always had a
very big heart he would show others respect and always have tried to make life easier for
others by providing his help wether it is lending a hand or just even being there to listen.

Bryan has a time where we were living together due to him not having no where to go being
that he really never had his father there and his mom being out of state. By that time I was
going to school and working. So he would help take my son to school and sometimes pick him
up. He would watch him for me while I worked. My son is very close to his uncle because he has
always been there for him and watched him grow up . Due to this situation my son has been
feeling down for not being able to see his uncle as much like he use to. He was also a great big
help for me being that he has always been there to help with this kid's. He would always sit and
talk with me when ever I felt down or needed someone to talk to .He would give me advice on
how to solve some of the situations I was going through. He always made sure me and the kids
were okay . Every time he saw me he would ask how I am doing and always ask for the kids. If
they happened to be with me he would ask to take my son to the park and play with him for
hours.

Despite the wrong decisions he has made in life Brian is a very noble person who always lend a
helping hand to the most needed. Sometimes he would talk to me about the things he has been
through and even cried because he felt deep shame of his actions. He would also talk to me and
ask advice in some situations.. His mother has been stressed out and developing health issues
due to this situation because she isn't able to see or hear her son much often . She misses him
very much as he was one of her oldest that helped her out financially. There was also a time
where he was tryin his best to better himself he went out looked for jobs. Tried to go for his

GED but life situations kept him from accomplishing these things. Things like needing to make money to provide for him and his family. Besides the poor choices he has made Bryan was trying to fix up his life in 2018. He was always responsible for himself and  was able to contain a job. Which is why I feel in my heart this time he would learn and come out to be a prosperous man. I am here to help him in the process into going back to school and help create him a resume . Also possibly helping him to get a job and back his feet . Bryan would also always be more than welcomed to live with me anytime .


Sincerely,

Carolina Blanco

# EXHIBIT E

Dear Judge Oetken,

My name is Lina Nunez, I live in Manhattan, and I'm Brian's younger sister. I'm 21 years old.

Brian and I lived together when we were very young. It was hard when our mom was sent to the DR, we got separated. I was living with a lady and Brian was sent somewhere else. It was hard to keep in touch, and for a while I was sent to Michigan where I was abused mentally and verbally, and with a lady who tried to keep me from my family. I wanted to leave her and Brian wanted to help me, but he was underage so I couldn't go stay with him. He tried to help me even though he was still a kid. Foster care was hard for Brian because most people would get adopted and get out of there, but he didn't.

We got to spend more time together when I got back to the Bronx. When I was staying with my older brother, Brian would watch me when my brother wasn't home. My other brother used to work in the mornings and Brian worked nights, so Brian would be there for me during the day. He would cook and keep the house clean. We would go outside together and to our grandmother's house. Brian was always there for our grandmother, every time she was sick he would go to the house and take care of her. Brian is always worrying about everyone except him. He is funny, telling me what to do.

When Brian got locked up the first time everyone was worrying, we didn't know what was happening. I was still young, maybe 13 or 14, so I didn't really know what was happening. When Brian was home he was working getting on track.

I talk to Brian on the phone and have tried to visit him. I've also come to see him at court. I feel sad because I know Brian is in there because he did something wrong, but I also don't think Brian had enough help because I know Brian. When he was in the hospital he always had to take medication and he went to the hospital. When he had his medication he would be calm and listen. When we were little and he didn't have his medication he would act out. I want to help him but I'm not his mom or dad. He needs to be going to a psychologist. Brian has been through a lot and he needs his medication.

A lot of people are waiting for Brian to come home and are excited for him. People are always asking me if they can send him stuff, when he has court, and how they can help him. When he comes home he's gonna have a lot of support, a lot of people are going to help him. We could help him move out of state and have a fresh start in a new environment, if he wants.

Brian just became an uncle, I just had a baby who I want him to meet. I love and miss him.


Lina Nunez

# EXHIBIT F

Dear Judge Oetken,

My name is Rosanna Mora and I am Brian's aunt on his mom's side. I am his mom's sister. I live in Massachusetts, and I work at the Eagle Tribune.

When Brian was young he was hyperactive so he took medication, I think it was through his school. It was like he couldn't focus. He was always looking around. But he was always a good kid. When he started taking medication it helped him a lot, he started taking it when he was young, maybe 7. At the time I was still living in New York. Every weekend I used to go to my sister's house to spend time with the kids. When it was summer we used to go to the beach or the park, to do something fun for the kids.

He was always a nice kid, if he had something he would always try and be helpful, if he had something, whether he needed it or not, he would give it to you. He is really honest and would always admit if he did something wrong. He was really obedient when he was a child.

When his mom was deported it was really really bad for him. He was very depressed and I would tell him to go to the doctor. He used to cry, he didn't want to talk to anyone. He was around 13 or 14. He would say he wanted to see his mom, he ever started to say that he would kill himself. By this point I had moved to Massachusetts but Brian and I were keeping in touch. It was hard for all of us when my sister got deported. Her deportation affected all of the kids a lot, and my mom started seeing a psychologist.

It was really bad the first time he got locked up. My mom is handicapped so she couldn't go see him, and she was the only one close over there. I work 6 days a week so I couldn't go over there, but Brian and I talked on the phone. When my father passed away we didn't tell him anything until he got out, because he was really attached. He was upset when he found out. I was afraid he was going to hurt himself in there, which is why we didn't tell him. When my other brother passed away he was really distressed. This was 2 years ago, that was his favorite uncle.

The last time I saw Brian it was before he got this time locked up. I saw him at a function and I was telling him to not get in trouble. He told me he was on Probation and he didn't want to go back there, but then months later I found out he was locked up.

I was surprised when I found out he was arrested because I knew he was working so hard to start over after he got released. He is doing his best to control himself and do good for himself. After he came out he was trying to be in his daughter's life. When he was working he was buying stuff for her to bring to her. He wasn't on child support but he was doing his job as a father. He always would say that he didn't have a father so he wanted to make sure his daughter had a father. He is a good father. When he spends time with his nieces and nephews he treats them like they're his kids. Buys things for them, takes them out to the park, takes them to the store to buy them food and clothes.

He doesn't have his GED and was planning to get it after he came home. Before Brian was arrested again he was trying to take a home attendant classes. My mom needed a home attendant and he didn't want it to be a stranger, because then we wouldn't know how they were going to treat her. He wanted to take care of her. He used to go grocery shopping for her to take care of what she needed. He used to bring her food that she loved like yoghurt, since she is on a special diet. He would get her whatever she needed for a special diet. Brian and my mom are close, he and all the grandkids call her mom. My mom has been suffering a lot because she can't go see him. He was trying to get his life together but unfortunately he went back to jail.

Since Brian was arrested we've been talking on the phone. He is still at the stage of missing his mom. Whenever I talk to him he tells me this and talks about how much he misses her. His father never was there, all he had was his mom. That probably got into his mind, I think he wonders if his life would be different if he had his dad. He didn't have a male figure to support him, that might have affected him.

My sister is always crying and calling me because she can't see him, since she is out of the country it can be hard for them to talk on the phone sometimes. It is painful for her to not know how Brian is doing, so when he calls me I call her after to let her know how he is. When Brian got hurt in the jail she and I were talking every single day about how Brian was doing. My sister was going crazy with worry.

Brian is asthmatic so that's another concern that I have, since I also have asthma. We worry about him getting his medication, especially with the pandemic. Judge, I hope you don't give Brian too much time. He is a good person, and I'm not just saying that because he is my nephew. Brian wants to get his life together, he wants to go back to school, work, be with his family, and  build his life out here. I will help him however I can, as his aunt.

Thank you,

Rosanna Mora

# EXHIBIT G

June 2019


Honorable J. Paul Oetken

United States District Judge


My name is Victoria Maldonado, I am Business Associate/Dental Assistant at Morris Heights Health Center.  I have three children and am currently a single mom.

Brian Mora is my fiancé and has been a part of my life for more than ten years.  Before we began a relationship we were great friends,  family one could say.  I met Brian when he was very  young still not an adult.  Brian struggled throughout his childhood without caring parents or guidance with school as well as socially.  Throughout all this Brian always smiled and managed to win over the hearts of many everywhere he goes.

Brian came into my home as I am a mother of three with no other help and became an active part of my family. My daughter who is now 12 years old loves and misses him greatly.  He would walk her to school in the morning and always play games with her.  I also have a baby almost two years old who was attached to Brian as he helped me with him, took him to day care,  cared  for him when he was sick.  Babe Ceasar even said his first word DADDA to him at 12 months old.  Brian has his nickname for the babe "Sputa" he calls him.  He also has a nickname for my daughter "Cookie".  Every day I came home from work when he wasn't at work himself he would be right in the kitchen with me cooking.

In 2015 I was diagnosed with pre cancer cells in my cervix and Brian stood by my side.  Brian was my mental, physical and emotional support.   The pre cancer cells  were  class III and needed to be removed with surgery.  Brian took care of me and my daughter at the time.  He helped me through a really rough and scary moment in my life.  For that I will be forever greatful.

Throughout the years Brian has helped soo many people.  I've seen him buy  food for someone who couldn't afford it. I've seen him stop everything to help my elderly  neighbors  with bags.  Brian continuously  insist on helping others.   Brian although never graduated high school and didn't even learn to read always tells the children in our neighborhood "get to school" go learn how to read don't be like me. Although he did not learn to read in school fluently he practiced reading and writing on his own. Although his spelling is not too great he has tried and is still trying to improve his reading.

The day Brian was arrested it broke my families heart.  My daughter was sad and has had a hard time adjusting to the fact that Brian won't be around for a long time.  "Sputa" the babe actually started pulling his hair and eating it shortly after Brian's arrest.  I've been working with him giving him other options instead of this and he has progressed and is not eating any hair or pulling any more.

Before this arrest Brian was actually working and playing the role of father in our family.   Upon his release after serving this time he will be coming to stay with me,  I believe Brian will have an even greater and more  positive influence in our families lives.  He has plans of working again and going to school while incarcerated for his GED to further his education out here.   We have spoken about when all this is over with moving out of state for a fresh start and a better life style.  While Brian is serving his time I am and will be by his side.  I will be bettering my education with online classes as I continue to work.  We plan on staying together and building our future again.

Sincerely,

Victoria Maldonado

# EXHIBIT H

Dear Judge,

I am Amanda Avila, I work for a dental office as insurance coordinator in central park. I have known Brian Mora for the past three years.

I remember a time when it was snowing bad outside. We saw a older lady trying to cross the street. But because of how bad the snow was she wasn't able to so Brian got out the car to help her. There even been times when the elevator wasn't working in the building. Brain would help people with there bags and women with there babies and strollers going up.

I know Brain has made a mistake and I'm aware of his actions. But him being in jail for two years has changed him to want to do better and to better person not only for him self but also for his family. Alot of Brian decision making had to do with child hood and up bringing. But since he been in jail he has honestly learned from this and wants to stay out of trouble for good. Don't want to end up back in jail.

When Brian gets out, he wants to go school to become a Barber and open up his own shop. He actually learned the skill while being  in jail and learned he enjoys doing it.


Amanda Avila

# EXHIBIT I

September 3, 2020

Honorable J. Paul Oetken:

My name is Taylor Lauesen and I am currently a graduate student at NYU in the Silver School of Social Work and the School of Global Public Health. I will finish my dual MSW/MPH degree in May 2021. In January 2019, I began working as a social work intern at the Federal Defenders New York (FDNY) office. This internship was an integral part of completing my social work degree and was just completed amidst the COVID-19 pandemic in April of this year. My job at FDNY was spent in close contact with clients who were currently incarcerated at the Manhattan or Brooklyn federal jails, offering both social support and mitigation services. It was here where I met Brian Mora. Clay Kaminsky, Brian's attorney, asked if I would start seeing Brian on a regular basis beginning last summer in a supportive counseling role.

I saw Brian on a weekly basis starting last summer all the way up until late winter of this year when circumstances at the MCC did not allow legal visits. Brian and I spent countless hours discussing a wide range of topics, and after I learned he had taught himself to read, I sent him a number or books to help him pass the time. I remember at one point early on in our meetings, Brian asked me to send him a workbook on cursive writing so he could practice. (He later asked me for a dictionary.)  I knew at this moment Brian was someone who was passionate and eager to learn anything that he could get his hands on.

We talked about sneakers (after we both learned how much we loved them!), sports, politics, and what life was like at the jail. To the latter topic, Brian and I worked on skills he could utilize in real time in order to increase his ability to de-escalate from a situation. I shared with Brian the theory and research pertaining to the fight or flight response. It was through this close examination of Brian's physical bodily responses to anger or stress that we could begin to talk about behavioral and actionable changes.

From Brian's candid sharing of his childhood and adolescence I realized most of his life had been spent in hypervigilance. Research in the field of trauma has emphasized how trauma has a way of becoming deep-seeded into the very fabric of our being, for Brian this was no different. The instinctual part of every human's brain, the oldest and most "reptilian," located at the base of our skulls, functions to keep us alive. For individuals who have experienced trauma, at the slightest hint of danger this part of the brain is activated, and the fight or flight response is initiated.

As Brian and I discussed this phenomenon, I shared with him ways in which he could intervene in this process before direct actions were taken on his part. This is not easy work by any means, particularly when Brian was experiencing trauma and stress everyday while incarcerated. However, there were quite a few moments when Brian would come down to the legal floor and share with me how he chose to turn away or not get in an altercation. This was monumental and incredibly significant! Change does not happen overnight, but I saw in Brian true effort and interest in this particular area of his life. Becoming more mindful and conscious of one's behaviors takes time, but I am certain Brian has gained the initial framework and tools necessary

to continue on his journey to becoming an individual who is not simply driven by his fight or flight response.

Through this work, Brian showed me his willingness to engage and learn about new and foreign topics. Brian has taken the time to think about how he himself has agency, and while he may feel like most of his life is dictated by someone else, he can still create a space for himself where he has control over his individual actions and behaviors.

The other salient and equally as critical conversation Brian and I had over the course of many weeks, was when we talked about his childhood and the future he would like to one day build for his children. Brian has experienced extreme hardship, trauma, and loss in the quarter of a century that he has been on this planet. On the flip side, Brian also recognizes and takes ownership for the choices he has made, even if the choices themselves were somewhat constrained. It is this holding space of both of these elements where I think Brian was able to really grow as a person and start to believe he can be a better man in the future, outside of the criminal justice system. I spoke at length with Brian about how his childhood and teenage experiences and upbringing shaped him into the person he is and continue to have a hold on the choices he makes. I shared with him the groundbreaking ACE Childhood studies, that highlighted how children who experience trauma are more likely to experience hardship as adults in a number of categories (including more likely to be incarcerated). Together, we also explored how, at the end of the day, Brian must hold himself accountable for his own behaviors and actions. I am confident Brian weighs each of this two sides of the same coin equally. On the one hand, Brian had no control over the family and neighborhood he was born into, but he does have the ability to become more conscious and mindful of his choices moving forward. I believe Brian now understands his own role in his present incarceration as well as circumstances outside of his control that also led him to this moment.

Moving forward, I see Brian as an example of someone who takes back control of their own life; who no longer allows outside forces to trigger an instinctual fight or flight response, but rather mindfully moves through the world with the knowledge he can shape his future. Brian yearns to be present for his children and family. I believe the support Brian has from the people in his life will assist him in staying true to his goal of leaving the criminal justice system behind once his sentence is finished. Additionally, Brian is aware that the Federal Defenders will always be a resource he can count on and utilize for support and guidance when he is back in the community. I look forward to the day Brian is released and can live a pro-social life.

Sincerely,
Taylor Lauesen, M.A.
NYU Silver School of Social Work
NYU School of Global Public Health